UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CHAPTER 7 |
| AKBAR BALUBHAI ALI aka Tony Ali | ) | CASE NO. 15-61641-pwb |
| | ) | |
| Debtors. | ) | |
| | ) | |
| SOHAIL ALI | ) | |
| | ) | |
| | ) | ADV. PROC. |
| Plaintiff, | ) | CASE NO. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| AKBAR BALUBHAI ALI aka Tony Ali, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DAMAGES AND FOR
## DETERMINATION OF NON-DISCHARGEABILITY
## AMENDED ANSWER AND COUNTERCLAIMS

COMES NOW Sohail Ali and hereby files this, his Complaint for Damages and

Determination of Non-Dischargeability, respectfully showing this Court as follows:

### JURISDICTION AND PARTIES

1.

Akbar Balubhai Ali aka Tony Ali ("Debtor" or "Tony Ali") filed a voluntary petition for

bankruptcy protection under Chapter 7 of the United States Bankruptcy Code on June 24, 2015.

2.

This adversary proceeding is commenced under Rule 7001(1), 7001(4), 7001(6), and

7001(9) of the Federal Rules of Bankruptcy Procedure, by Plaintiff, Sohail Ali, seeking a money

judgment in an amount to be determined at trial and a determination of nondischargeability of the debt owed to Plaintiff by Debtor pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6).

3.

This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.

4.

Venue is proper in this District by virtue of 28 U.S.C. § 1409(a), as this proceeding arises and relates to a case under the Bankruptcy Code pending in this District.

5.

This is a core proceeding under 11 U.S.C. §157(b)(2)(i).

6.

Sohail Ali is a resident of the State of Georgia.

**FACTS**

7.

At all times relevant to this lawsuit, Plaintiff Sohail Ali has been a shareholder of Nice Finacial Services, Inc. ("NFSI"). Debtor is a shareholder and officer of NFSI.

8.

NFSI owns and operates check cashing and financial services stores in the metro Atlanta area.

2

9.

Almost since the beginning of Sohail Ali's investment and involvement with NFSI, the Debtor has waged a campaign of intimidation through repeated frivolous litigation.

10.

By way of background, on or about February 19, 2008, among other lawsuits, Tony Ali brought a lawsuit against Defendant Sohail Ali in the Superior Court of Gwinnett County titled *Akbar Ali, Madatali Umani, Muradali Umani, and Irfan Merchant v. Sohail Ali, Nice Financial Services, Inc., and Azziz Hussain,* Civil Action No. 08A-016592. Said case was assigned to Judge Debra Turner (the "Turner Case").

11.

In the Turner Case, the Debtor brought various allegations against Sohail Ali, including but not limited to the following: fraud, breach of fiduciary duty, unjust enrichment and a claim for attorney's fees.

12.

After approximately three years of litigation in the Turner Case, the parties entered into a handwritten settlement agreement on November 9, 2011.

13.

On March 17, 2011, a mutual dismissal with prejudice was filed by all parties in the Turner Case, dismissing "the complaint, answer, counterclaims, and all responsive pleadings in the above-styled action, said dismissals being with prejudice as to all claims, defenses, or counterclaims that were asserted or could have been asserted. . ."

3

14.

The Mutual Dismissal With Prejudice (the "Dismissal") was executed by counsel for all parties (including counsel for Plaintiff in this case) and attached a copy of the handwritten settlement agreement, entitled "Settlement Agreement and Full Release of All Claims By All Parties" (the "Settlement Agreement"). A true and correct copy of the Settlement Agreement is attached hereto as Exhibit "A."

15.

Among other things, the Settlement Agreement provided for the following:

(a)     Entry into a written lease between NFSI and Tara Road Properties for the space occupied by NFSI at 6380 Tara Road, said lease to include an eight year term and monthly rent in the amount of $5,000, which includes taxes, common area maintenance, assessments and liability insurance;

(b)      Repayment of a loan to Sohail Ali by payment of a lump sum of $100,000 with additional annual payments equal to forty-five percent of the net profits of NFSI paid to Sohail Ali, beginning on May 15, 2011;

(c)     Release of all parties' claims;

(d)     Payment of Sohail Ali's attorney's fees;

(e)     Release of a voting proxy held by Sohail Ali with respect to Madatali Umani's shares in NFSI; and

(f)     No salaries or other compensation until certain loan repayment obligations are met.

4

16.

Once the Dismissal was filed, the Debtor refused to abide by the terms of the Settlement Agreement.

17.

Mere months after the dismissal of the Turner Case, Debtor, along with other co-owners of NFSI, brought a new lawsuit against Sohail Ali, styled *Tony Ali, Irfan Merchant, Arif Merchant, Raj Umani, and Madatali Umani v. Sohail Ali*, Superior Court, Gwinnett County, Georgia, Civil Action File NO. 11A-09456-2, which is still pending and is assigned to Judge Iannazzone (the "Iannazzone Case"). Among other allegations in this lawsuit, Debtor alleges that he is entitled to a 50% interest in the real property located at 6380 Tara Road.

18.

Furthermore, the Debtor, through NFSI, brought yet another civil action against Sohail Ali in the case of *Nice Financial Services, Inc. v. Sohail Ali, Aziz Hussain, and Tara Road Properties, LLC*, Superior Court, Gwinnett County, Georgia, Civil Action File NO. 11A-08497-3, which is also still pending.

19.

Given that the these lawsuit were filed a mere four months since the dismissal with prejudice of the Turner Case, and given that Debtor caused NFSI to fail to pay rents or provide any requested information regarding the operation of NFSI, it is clear that the Debtor never intended to abide by his obligations under the Settlement Agreement.

5

20.

In late-spring of 2013, Sohail Ali visited NFSI's Old National Highway location, NFSI's most consistent and lucrative location, to ascertain the location's status.

21.

Upon arrival at the location, Sohail Ali discovered multiple signs on the windows and inside the door referring NFSI's customers to "our newest location" at 5015 Old National Highway.

22.

NFSI does not operate a location at 5015 Old National Highway.

23.

Upon investigation, Sohail Ali discovered that the 5015 Old National Highway location belonged to Trimax, which is solely owned by Tony Ali, and which Tony Ali had recently opened.

24.

Sohail Ali asked certain employees at the NFSI location about the signs, was informed that the NFSI location would soon close, and that he and other NFSI customers should visit what they characterized as NFSI's "new location" at 5015 Old National Highway.

25.

Sohail Ali further noticed that the operational staff at that location had been reduced to below effective levels, diminishing their ability to efficiently serve NFSI clients.

26.

Upon information and belief, Tony Ali, as an agent for Trimax, directed the NFSI employees to place the signs in the NFSI location directing NFSI customers to the newly opened Trimax location, and further directed the employees to refer NFSI customers to Trimax.

27.

Shortly thereafter, and through correspondence from Tony Ali's former counsel dated May 24, 2013, Defendant learned that Tony Ali was threatening to close the 5195 Old National Highway location.  A true and correct copy of the May 24, 2013, correspondence is attached hereto as Exhibit "B."

28.

Tony Ali, through his counsel, indicated that NFSI's landlord at that location would terminate the lease unless Sohail Ali executed a personal guaranty on behalf of NFSI at that location.

29.

Tony Ali also demanded that Sohail Ali execute a personal guaranty on NFSI's Western Union contract as a condition to ensuring the lease would not be terminated.

30.

These statements, which were made repeatedly by Tony Ali, NFSI, and their former counsel, conflict directly the testimony of the landlord's agent, among other things.  A true and correct copy of the affidavit of Joe Culotta is attached hereto as Exhibit "C."

7

31.

Despite Tony Ali's contentions to the contrary, Joe Culotta testified in his affidavit that "Tony Ali desired to terminate the existing lease because he had recently taken over NFSI Financial, and in order to remove Madatali Umani as the personal guarantor, and to execute a new lease in a new name." Exhibit C, ¶ 11.

32.

Finally, Culotta testified that "Newburger-Andes thinks highly of NFSI Financial Services, Inc., as a tenant, and at no point has threatened to terminate NFSI's lease at 5195 Old National Highway." Exhibit C, ¶ 12.

33.

Culotta's testimony and other facts reveal that any threat of termination came not from the landlord, but solely from Tony Ali, who was using the threats in an attempt to extort Sohail Ali's personal guaranties.

34.

Upon learning of Tony Ali's fraudulent threats to close NFSI's Old National Highway location on June 30, 2013, Sohail Ali filed an Emergency Motion for Temporary Restraining Order, Motion for Appointment of Receiver, and Motion to Amend Answer and Counterclaims and Add New Party on June 28, 2013.

35.

Among other things, the Motion sought to enjoin Tony Ali from closing the Old National Highway location and thereby causing NFSI irreparable harm.

36.

Despite receipt of the Motion, and despite the court's delay in hearing the Motion until July 1 – when counsel for Tony Ali could be present – Tony Ali unilaterally closed NFSI's Old National Highway location on June 30, 2013.

37.

The above facts, among others, caused the court to appoint a Receiver over NFSI.

38.

Trimax and Tony Ali orchestrated the closure of NFSI's Old National Highway location Trimax by removing the only other nearby competitor.

39.

Tony Ali has repeatedly made other false and fraudulent statements to Sohail Ali and the Receiver similar to those relating to the closure of NFSI's Old National Highway location.

40.

Tony Ali has likewise made false and fraudulent statements concerning NFSI's finances, including, among other things, repeated denials that he was taking money for a salary in violation of the Settlement Agreement between the parties.

41.

Subsequent to the appointment of the Receiver, and upon a review of the financial records provided to the Receiver, it has further become apparent that Tony Ali has, during 2013, illegally personally withdrawn over $420,000.00 from NFSI.

42.

Due to Tony Ali's removal of the NFSI monies, NFSI has been unable to fulfill its alleged debt obligations to Western Union, and Tony Ali therefore placed NFSI in an out-of-trust position with Western Union, subjecting NFSI to further costly litigation.

43.

Much of this money was taken in the month or two prior to Trimax's opening of its new location, and just prior to Tony Ali's closure of the NFSI Old National Highway location.

44.

Upon information and belief, Tony Ali used certain of these NFSI monies to finance Trimax operations.

45.

Tony Ali has, to date, failed and refused to account for the missing funds, and has failed and refused to return the missing funds.

46.

Furthermore, Debtor recently settled a lawsuit brought by NFSI against the City of Morrow, GA and rather than turn the funds received from the City over to NFSI, Debtor converted the funds for his own personal use.

47.

This action is not a collusive attempt to confer jurisdiction that the court would otherwise lack.

48.

Sohail Ali has brought these allegations to the attention of both former counsel for NFSI and the Receiver, orally and in writing.  Despite being made aware of these allegations, neither former counsel nor the Receiver has pursued claims on behalf of NFSI.

## COUNT ONE: DECLARATORY JUDGMENT

49.

Sohail Ali incorporates by reference the allegations above as if restated herein.

50.

Based on the Debtor's conduct, Sohail Ali is in need of a declaration of the parties' respective rights and obligations under the Settlement Agreement.

51.

An actual controversy exists between the parties hereto as to whether or not the Debtor has violated the terms of the Settlement Agreement.

52.

An actual controversy exists between the parties hereto as to whether or not the Debtor's conduct in failing to enter into a written lease and pay monthly rents as required under the Settlement Agreement constitutes a breach of the Settlement Agreement.

53.

An actual controversy also exists between the parties regarding the ownership of the real property located at 6380 Tara Road.

54.

Given the Debtor's preference for constant litigation, it is important for the Court to provide guidance with respect to the parties' rights and obligations under the Settlement Agreement.

55.

In light of this controversy, it is necessary and proper that the rights and status between the Parties hereto be declared.

## FOR A FIRST CAUSE OF ACTION AGAINST TONY ALI
(Breach of Fiduciary Duty)
11 U.S.C. § 523(a)(4)

56.

Defendant incorporates by reference the prior consistent defenses and allegations as if fully restated herein verbatim.

57.

As an officer of NFSI, Tony Ali owed a fiduciary duty to NFSI and its shareholders.

58.

Tony Ali breached that duty by, among other things, orchestrating the closure of the Old National Highway location, misappropriating corporate resources, by falsifying corporate records, and by intentionally misrepresenting the status of the company and its contracts to Sohail Ali.

59.

As a direct and proximate result of this breach, Sohail Ali has suffered harm in an amount to be determined at trial.

60.

Tony Ali's conduct outlined above constitutes stubborn litigiousness, bad faith, or has caused Sohail Ali unnecessary trouble and expense, and Sohail Ali is entitled to an award of the expenses of litigation under O.C.G.A. § 13-6-11.

61.

Tony Ali's actions showed willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care which would raise the presumption of conscious indifference to consequences. Furthermore, Tony Ali acted with a specific intent to cause harm to Sohail Ali and NFSI. As a direct and proximate result, Sohail Ali is entitled to an award of punitive damages, not limited to any statutory amount.

**FOR A SECOND CAUSE OF ACTION AGAINST TONY ALI**
(Breach of Contract)
11 U.S.C. § 523(a)(6)

62.

Defendant incorporates by reference the prior consistent defenses and allegations as if fully restated herein verbatim.

63.

Tony Ali and Sohail Ali acquired their shares in NFSI through the execution of a Stock Purchase and Shareholder Agreement dated January 19, 2005, a copy of which is attached hereto as Exhibit "D."

64.

The Stock Purchase and Shareholder Agreement contains a "Restriction on Competition" that restricts Tony Ali and Sohail Ali from certain forms of competition.

65.

Tony Ali's operation of a Trimax location less than two-tenths of a mile from NFSI's Old National Highway location violates that restriction, and breaches that contract.

66.

As a direct and proximate result of that breach, Sohail has suffered harm in an amount to be determined at trial.

67.

Tony Ali's conduct outlined above constitutes stubborn litigiousness, bad faith, or has caused Sohail Ali unnecessary trouble and expense, and Sohail Ali is entitled to an award of the expenses of litigation under O.C.G.A. § 13-6-11.

68.

Tony Ali's actions showed willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care which would raise the presumption of conscious indifference to consequences.  Furthermore, Tony Ali acted with a specific intent to cause harm to Sohail Ali

14

and NFSI.   As a direct and proximate result, Sohail Ali is entitled to an award of punitive damages, not limited to any statutory amount.

### FOR A THIRD CAUSE OF ACTION AGAINST TONY ALI
(Misappropriation of Corporate Assets)
11 U.S.C. § 523(a)(4)

69.

Defendant incorporates by reference the prior consistent defenses and allegations as if fully restated herein verbatim.

70.

As set forth above, Tony Ali misappropriated over $420,000.00 of NFSI's funds, and is currently in possession of those funds, having refused to either account for or return the money.

71.

In an effort to hide this misappropriation, Tony Ali has falsified corporate records, or directed the falsification of NFSI's corporate records.

72.

As a direct and proximate result, Sohail Ali has suffered damages in an amount to be determined at trial.

73.

Tony Ali's conduct outlined above constitutes stubborn litigiousness, bad faith, or has caused Sohail Ali unnecessary trouble and expense, and Sohail Ali is entitled to an award of the expenses of litigation under O.C.G.A. § 13-6-11.

74.

Tony Ali's actions showed willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care which would raise the presumption of conscious indifference to consequences. Furthermore, Tony Ali acted with a specific intent to cause harm to Sohail Ali and NFSI. As a direct and proximate result, Sohail Ali is entitled to an award of punitive damages, not limited to any statutory amount.

**FOR A FOURTH CAUSE OF ACTION AGAINST TONY ALI**
(Breach of Settlement Agreement)
11 U.S.C. § 523(a)(6)

75.

Defendant incorporates by reference the prior consistent defenses and allegations as if fully restated herein verbatim.

76.

Tony Ali breached the Settlement Agreement between the parties by, among other things and including but not limited to the conduct outlined above, taking compensation as President and manager of NFSI in violation of the Settlement Agreement, and by refusing to pay debts owed to Sohail Ali from NFSI profits.

77.

As a direct and proximate result of Tony Ali's breach of the Settlement Agreement, Sohail Ali has suffered damages in an amount to be proven at trial.

78.

Tony Ali's conduct outlined above constitutes stubborn litigiousness, bad faith, or has caused Sohail Ali unnecessary trouble and expense, and Sohail Ali is entitled to an award of the expenses of litigation under O.C.G.A. § 13-6-11.

79.

Tony Ali's actions showed willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care which would raise the presumption of conscious indifference to consequences.  Furthermore, Tony Ali acted with a specific intent to cause harm to Sohail Ali and NFSI.  As a direct and proximate result, Sohail Ali is entitled to an award of punitive damages, not limited to any statutory amount.

**FOR A FIFTH CAUSE OF ACTION AGAINST TONY ALI**
(Conversion)
11 U.S.C. § 523(a)(4)

80.

Defendant incorporates by reference the prior consistent defenses and allegations as if fully restated herein verbatim.

81.

As outlined above, Tony Ali has illegally withdrawn over $420,000.00 from NFSI accounts during 2013, and has refused to either account for or return the money, despite demands.

82.

As a direct and proximate result, Sohail Ali has suffered damages in an amount to be proven at trial.

83.

Tony Ali's conduct outlined above constitutes stubborn litigiousness, bad faith, or has caused Sohail Ali unnecessary trouble and expense, and Sohail Ali is entitled to an award of the expenses of litigation under O.C.G.A. § 13-6-11.

84.

Tony Ali's actions showed willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care which would raise the presumption of conscious indifference to consequences. Furthermore, Tony Ali acted with a specific intent to cause harm to Sohail Ali and NFSI. As a direct and proximate result, Sohail Ali is entitled to an award of punitive damages, not limited to any statutory amount.

**FOR A SIXTH CAUSE OF ACTION AGAINST TONY ALI**
(Fraud)
11 U.S.C. 523(a)(2)

85.

Defendant incorporates by reference the prior consistent defenses and allegations as if fully restated herein verbatim.

86.

Tony Ali has made numerous false representations to Sohail Ali including, but not limited to, his taking of a salary, his management of NFSI, NFSI's accounting records, and NFSI's various lease arrangements.

87.

Tony Ali intended to deceive Sohail Ali when making these false representations, and intended to keep Sohail from acting with regards to these subjects or to act in a certain manner with respect to these subjects.

88.

Sohail Ali justifiably relied on these misrepresentations.

89.

As a direct and proximate result, Sohail Ali has suffered damages in an amount to be proven at trial.

90.

Tony Ali's conduct outlined above constitutes stubborn litigiousness, bad faith, or has caused Sohail Ali unnecessary trouble and expense, and Sohail Ali is entitled to an award of the expenses of litigation under O.C.G.A. § 13-6-11.

91.

Tony Ali's actions showed willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care which would raise the presumption of conscious indifference to consequences. Furthermore, Tony Ali acted with a specific intent to cause harm to Sohail Ali

and NFSI.  As a direct and proximate result, Sohail Ali is entitled to an award of punitive damages, not limited to any statutory amount.

WHEREFORE, Plaintiff respectfully requests the following relief:

1.    A civil trial by jury;

2.    Judgment for Sohail Ali as to all claims in an amount to be determined at trial;

3.    Compensatory damages in an amount to be determined at trial;

4.    Punitive damages in an amount to be determined at trial, not limited to any statutory amount;

5.    Attorney's fees and costs of suit;

6.    Order that said debt or debts be declared non-dischargeable pursuant to 11 U.S.C. § 523; and

7.    Such other and further relief as this Court deems just and proper.

This 28th day of September, 2015.

ANDERSEN, TATE & CARR, P.C.

/s/ James C. Joedecke Jr.
James C. Joedecke, Jr.
Georgia Bar No. 391885
jjoedecke@atclawfirm.com
Robert D. Thomas
Georgia Bar No. 278646
rthomas@atclawfirm.com
Kenneth J. Bentley
Georgia Bar No. 715496

1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile
2446344_1

11/09/2010 TUE 18:49  FAX 404 842 7222 LAW OFFICE                    ☒001/009

Settlement Agreement and
Full Release of all Claims by
All Parties                                        pg. 1

1. lease b/t Nice + Tara Rd Prop for 6580 Tara Rbd

$5,000    pk →   lease to include all taxes, CAM, assessments
                prop. liability Ins. (Nice add'l insured on prop
                owners)

        - 8 yrs.

② Sohail Ali — $100,000 loan repayment on or
   before May 15, 2011
      · 45% of net profits on or before May 15 +
        annually thereafter

③ Arif Merchant - $1.08 loan repayment to begin
   on May 15, 2011, 55% of net profit after
   Sohail Ali's $100,000.

④ After May 15, 2011 Sohail Ali shall be entitled
   to 45% of net profits to be distributed on May 15th
   annually.

⑤ Arif Merchant shall be entitled to 55% of net profits
   to be distributed on May 15th annually until such
   time his $1.08(mil) loan is repaid in full.
      · if Arif Merchant is not paid $1.08 (mil) in full
        through an annual payment equal to 55% of net
        profits within 8 yrs (payment in full by 2017)
        6% annual interest shall accrue on any outstanding
        balance.

Sara DM

EXHIBIT
A
Blumberg No. 5119

pg-2

6) Upon execution of this Agreement Sohail Ali shall release his voting proxy of Mudatali Usmani's shares.

7) Upon Arif Merchant's loan being repaid ~~in 3 yrs.~~ Irfan Merchant, at the time of final payment to Arif Merchant, shall release and transfer his 15% shares to ~~Akbar Ali~~ Nice financial.

8) 6380 Tara Blvd Properties, LLC. ~~[scribbled out]~~

- Upon satisfaction of the loan debt to Arif Merchant, Tara Bd. LLC shall convey its 50% ownership in 6380 Tara Blvd to Akbar Ali.

9) The owner of 6380 Tara Blvd shall cause a Deed to Secure debt to be issued in favor of Arif Merchant in the amount of $1.08 (mil)

[left margin notes, partly legible:]
6380 Tara Blvd Properties, LLC
Security Deed
agent debt for
70% of property
A Merchant &

$200,000 + 50%
Sohail Ali,
upon payment in full
A. Merchant's ll (0.8 mil)
d A. Merchant's firm
satisfaction of
t Tara Bd.
op, LLC through
ts agent Sohail
Ali shall transfer
n quit claim deed
0% ownership to
bry Ali.

pg. 4

~~Transfers A $200,000~~
~~Rofers $ 200,000~~

(14.) Non-Compete from prior agreement 7050 tara Blvd

(5.) Any amount over $~~250,000~~ in net profits
after distributions to Sohail Ali & Arif Merchant
remaining net profit shall be disbursed equally among
Ismali creditors. If the net profit is less than $250,000
the Ismali creditors shall receive 10% of the net profits.

(16.) No shareholders in Nice shall draw annual
salaries until each time Arif Merchant's loan is paid
in full.

(17.) Nice will secure $500,000 (loan) ~~Set~~ to Sohail Ali
$500,000 (loan) ~~Set~~ to Arif Merchant

Sohail Ali, Individually                          Azlan Ali,

Sohail Ali, As President                          Irfan Merchant
of Nice Financial Svcs

Arif Merchant                                     Mwdatali Umanji

Mwdatali Umanji as his
duly appointed agent       This the 9th day of November, 2011.

The Parties Acknowledges this is a binding &
a Legally Ms. agreement.

## SOHAIL ALI WAIVER OF CONFLICT AND ATTORNEY

_____Sohail Ali_____, Sohail Ali, is the Defendant in various legal
actions brought by The Hoffecker Law Group, P.C. and its attorneys on behalf of Akbar Ali,
Muradali Umani, Madatali Umani, Irfan Merchant and Arif Merchant alleging against Sohail Ali
and Nice Financial Service. A lawsuit has already been filed in the Gwinnett County Superior
Court. Sohail Ali has retained counsel in these actions and has been represented by counsel.

Client Initials: _____

Sohail Ali is aware of and has specifically been notified this firm represented Akbar Ali,
Madatali Umani, Arif Merchant and Irfan Merchant as minority shareholders of Nice Financial
Services, Inc. in a lawsuit against Sohail Ali and Nice Financial Services, Inc. Mr. Ali has
negotiated with these parties without counsel counsel or advice of the Hoffecker Law Group.
Sohail Ali has reached a settlement in theory with all parties and wishes The Hoffecker Law
Group to memorialize the agreement in writing. Sohail Ali has considered the apparent conflict
and understands this firm can and will only act to reduce to writing the Settlement Agreement
negotiated by the parties without involvement of Charles Hoffecker or any other lawyer at the
Hoffecker Law Group.

Client Initials: _____

Date: _11/9/2010_                Signature: _____

                                Print Name: _Sohail Ali_____

## MURADALI UMANI WAIVER OF CONFLICT

*MURADALI UMANI*, hereinafter Client, retained The Hoffecker Law Group, P.C. and its attorneys to represent him in a lawsuit against Sohail Ali and Nice Financial Services, Inc.  Client was an officer at Nice Financial Services, Inc. and is owed an undetermined amount of money as a result of claims brought against Sohail Ali and Nice Financial Service.  A lawsuit has already been filed in the Gwinnett County Superior Court with Madatali Umani as the Plaintiff.

Client Initials: _____

Client is aware of and has specifically been notified this firm represented Akbar Ali, Madatali Umani, Irfan Merchant and Arif Merchant – as minority shareholders and creditor of Nice Financial Services, Inc. in a lawsuit against Sohail Ali and Nice Financial Services, Inc. Client is aware Akbar Ali, Irfan Merchant and Arif Merchant may have claims against him or claims that are adverse to his interests in Nice Financial.  This conflict between Client and Akbar Ali, Madatali Umani and the Merchants arose only recently and The Hoffecker Law Group advised Client and Akbar Ali, the Umanis and the Merchants attorneys from the firm could no longer represent any party.

Client Initials: _____

Client has continued to negotiate with Sohail Ali, Nice Financial, Akbar Ali and the Merchants without counsel or advice of the Hoffecker Law Group.  Client has reached a settlement in theory with all parties and wishes The Hoffecker Law Group to memorialize the agreement in writing.  Client has considered the apparent conflict and understands this firm can and will only act to reduce to writing the Settlement Agreement negotiated by the parties without involvement of Charles Hoffecker or any other lawyer at the Hoffecker Law Group.  Client waives the apparent conflict of interest for this firm to prepare the Settlement Agreement on his behalf, Akbar Ali's and Madatali Umani's and Arif Merchant's behalf and on behalf of Sohail Ali.

Client Initials: _____

Date: 11 | 8 | 10 _____          Signature: _____

Print Name: MURADALI UMANI

## AKBAR ALI WAIVER OF CONFLICT

_Akbar B Ali_, hereinafter Client, retained The Hoffecker Law Group, P.C. and its attorneys to represent him in a lawsuit against Sohail Ali and Nice Financial Services, Inc. Client was an officer and shareholder in Nice Financial Services, Inc. and is owed an undetermined amount of money as a result of claims brought against Sohail Ali and Nice Financial Service. A lawsuit has already been filed in the Gwinnett County Superior Court with Akbar Ali as the Plaintiff.

Client Initials: _____

Client is aware of and has specifically been notified this firm represents Arif and Irfan Merchant – as minority shareholder and creditor of Nice Financial Services, Inc. in a lawsuit against Sohail Ali and Nice Financial Services, Inc. Client is aware the Merchants may have claims against him or claims that are adverse to his interests in Nice Financial. This conflict between Client and the Merchants arose only recently and The Hoffecker Law Group advised Client and the Merchants attorneys from the firm could no longer represent either party.

Client Initials: _____

Client has continued to negotiate with Sohail Ali, Nice Financial and the Merchants without counsel or advice of the Hoffecker Law Group. Client has reached a settlement in theory with all parties and wishes The Hoffecker Law Group to memorialize the agreement in writing. Client has considered the apparent conflict and understands this firm can and will only act to reduce to writing the Settlement Agreement negotiated by the parties without involvement of Charles Hoffecker or any other lawyer at the Hoffecker Law Group. Client waives the apparent conflict of interest for this firm to prepare the Settlement Agreement on his behalf, the Merchants' behalf and on behalf of Sohail Ali.

Client Initials: _____

Date: _11. 09. 2010_            Signature: _____

                               Print Name: _Akbar Ali_

## ARIF MERCHANT WAIVER OF CONFLICT

*ARIF MERCHANT*_____, hereinafter Client, retained The Hoffecker Law Group, P.C. and its attorneys to represent him in a lawsuit against Sohail Ali and Nice Financial Services, Inc. Client is a creditor of Nice Financial Services, Inc. and is owed an undetermined amount of money as a result of claims brought against Sohail Ali and Nice Financial Service. A lawsuit has already been filed in the Gwinnett County Superior Court with Arif Merchant as the Plaintiff.

Client Initials: _____

Client is aware of and has specifically been notified this firm represented Akbar Ali, Madatali Umani, Irfan Merchant– as minority shareholders of Nice Financial Services, Inc. in a lawsuit against Sohail Ali and Nice Financial Services, Inc. Client is aware Akbar Ali, Irfan Merchant and the Umanis may have claims against him or claims that are adverse to his interests in Nice Financial. This conflict between Client and Akbar Ali, Madatali Umani, and Muradali Umani arose only recently and The Hoffecker Law Group advised Client and Akbar Ali, the Umanis and the Merchants attorneys from the firm could no longer represent any party.

Client Initials: _____

Client has continued to negotiate with Sohail Ali, Nice Financial, Akbar Ali and the Umanis without counsel or advice of the Hoffecker Law Group. Client has reached a settlement in theory with all parties and wishes The Hoffecker Law Group to memorialize the agreement in writing. Client has considered the apparent conflict and understands this firm can and will only act to reduce to writing the Settlement Agreement negotiated by the parties without involvement of Charles Hoffecker or any other lawyer at the Hoffecker Law Group. Client waives the apparent conflict of interest for this firm to prepare the Settlement Agreement on his behalf, Akbar Ali's and Madatali Umani's, Muradali Umani's and Irfan Merchant's behalf and on behalf of Sohail Ali.

Client Initials: _____

Date: _11/08/10_

Signature: _____

Print Name: *ARIF MERCHANT*

Sent By: NEY RUSSELL HOFFECKER & ERCK;    4042332404;    May-24-13 16:26;    Page 2/3

# NEY HOFFECKER & ERCK

ATTORNEYS AT LAW

**CHARLES HOFFECKER**
Direct Dial 404-885-7576
Fax 404-233-2404
chad@nhelaw.com
www.nhelaw.com

SUITE 2220, RESURGENS PLAZA
945 EAST PACES FERRY ROAD
ATLANTA, GEORGIA 30326

May 24, 2013

**VIA FACSIMILE ONLY**

James C. Joedecke, Jr., Esq.
Andersen, Tate & Carr, P.C.
One Sugarloaf Centre, Suite 4000
1960 Satellite Boulevard
Duluth, Georgia 30097

RE:    NFSI v. Ali, et al.
       Superior Court of Gwinnett County
       Case No.: 11A-08497-3

Dear Jim:

Please find enclosed a Notice to Terminate/Termination Agreement related to the lease at the NFSI 5195 Old National Highway location. In reviewing the lease with the landlord for possible extension, it apparently came to light for the first time that Madatali Umani was no longer the 100% owner of NFSI or even a shareholder. This information should have been conveyed to the landlord under the terms of the lease during Sohail Ali's tenure as the sole officer and director.

The landlord is obviously concerned with the fact that there is no officer or shareholder of NFSI as a guarantor to the Lease. Therefore, the landlord has indicated it intends to terminate the lease at the Old National Highway NFSI location. The only way the landlord will extend the lease and not terminate the current lease term is if the current shareholders personally guarantee the lease. To this end, Tony Ali (as holder of 55% of the outstanding shares) is willing to sign a personal guarantee of the Old National Highway lease. However, the landlord will also require Sohail Ali to sign a personal guarantee for his 45% ownership interest.

Please advise immediately as to whether or not your client intends to fulfill his responsibilities and sign a personal guarantee in his capacity as a shareholder of NFIS.

Sincerely,

Charles Hoffecker

CH/ser
Enclosures

1 | Page

**EXHIBIT B**

## <u>AFFIDAVIT OF JOE CULOTTA</u>

Personally appeared before me, the undersigned officer duly authorized to administer oaths, Mr. Joe Culotta, who, after being duly sworn, declares as follows:

1.

My name is Joe Culotta. I am over the age of twenty-one (21) years and am competent to testify to the matters contained herein.

2.

The following testimony is based upon my personal knowledge.

3.

I am a sales and leasing executive with Newburger-Andes Real Estate Investments.

4.

Newburger-Andes manages the leasing of certain property located at 5195 Old National Highway, Atlanta, Georgia.

5.

Newberger-Andes has previously worked with Nice Financial Services, Inc., with respect to the property at 5195 Old National Highway, and maintains a productive and mutually beneficial relationship with that company.

6.

Tony Ali recently approached Newburger-Andes with respect to the lease of property located at the 5195 Old National Highway location, which Nice currently leases and has for some time.

7.

Newburger-Andes did not approach Tony Ali with respect to the lease.

8.



Tony Ali desired to terminate the existing lease because he had recently taken over Nice Financial, and in order to remove Madatali Umani as the personal guarantor on the lease, and to execute a new lease in a new name.

9.

In order to handle this transaction, Newburger-Andes prepared a Lease Termination document, and a new lease.

10.

To date, upon my own personal knowledge, neither document has been executed.

11.

Newburger-Andes did not initiate these discussions. The discussions were initiated by Tony Ali, due to his stated desire to remove Madatali Umani as a guarantor, and because he had recently taken over Nice Financial.

12.

Newburger-Andes thinks highly of Nice Financial Services, Inc., as a tenant, and at no point has threatened to terminate Nice's lease at 5195 Old National Highway.

13.

During this discussions, I do not recall Tony Ali ever mentioning Sohail Ali.

Further Affiant sayeth not.

This 13 day of June, 2013

_____
Joe Culotta

Sworn to and subscribed before me this 13 day of June, 2013

_____
Notary Public

<u>STOCK PURCHASE AND</u>

<u>SHAREHOLDER AGREEMENT</u>

THIS AGREEMENT is made and entered into as of the 29th day of January, 2005, by and between NICE FINANCIAL SERVICES, INC. (hereinafter "Corporation" OR "NICE FINANCIAL"), SOHAIL ALI (SOHAIL), IRFAN MERCHANT, (MERCHANT), MADATALI UMANI (UMANI), and AKBAR ALI (AKBAR) (SOHAIL, MERCHANT, UMANI, and AKBAR are sometimes hereinafter collectively referred to as "Shareholder" or "Shareholders").

WHEREAS, UMANI currently owns all of the issued and outstanding stock of the Corporation (500 shares of common stock), and,

WHEREAS, Corporation is authorized to and hereby does issue 2000 additional shares of common stock, and,

WHEREAS, SOHAIL, MERCHANT, and AKBAR desire to acquire an ownership interest in the Corporation in the following amounts:

| | |
|---|---|
| MERCHANT | 375 shares |
| SOHAIL | 1125 shares |
| AKBAR | 500 shares; |

and

WHEREAS, SOHAIL has agreed to make available to NICE FINANCIAL a line of credit in the amount of $400,000 to be repaid in full not later than May 1, 2006, and,

WHEREAS, SOHAIL has agreed to loan to NICE FINANCIAL the amount of $800,000.00, and to make a capital investment of $500,000.00, and,

WHEREAS, UMANI has agreed to convey an interest in certain real property to SOHAIL in consideration of SOHAIL's obligations hereunder,

WHEREAS, Corporation shall issue stock certificates as provided herein at the office of Tom Fisher on January 20, 2005.

WHEREAS, the Shareholders and Corporation desire to promote their mutual interests by imposing certain restrictions and obligations on the outstanding shares of the common stock of Corporation issued to the Shareholders and provide for the decision making authority for the operation of the Corporation;

NOW, THEREFORE, in consideration of One Dollar ($1.00) in hand paid by each party

shareholder-nice

EXHIBIT
D

hereto to the other, the premises and covenants contained herein, and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## LIFETIME RESTRICTIONS

1.1 No Shareholder shall sell, transfer, assign, pledge, make a gift of or otherwise dispose of his stock of Corporation, voluntarily or involuntarily, except with the written consent of all the other Shareholders whose consent will not be unreasonably withheld.

2.

## INVESTMENT OBLIGATIONS

2.1 Subject to the provisions of this Agreement, the Shareholders will be required to contribute on a pro rata basis determined in accordance with their stock ownership the funds necessary to satisfy the future financial obligations of NICE FINANCIAL. In addition, the Shareholders acknowledge and agree that NICE FINANCIAL has certain financial obligations as of the date hereof which are set forth on Exhibit A attached hereto. The Shareholders agree that to the extent that the cash flow of NICE FINANCIAL is inadequate to satisfy these obligations as and when they are due that they will not be obligated to contribute on a pro rata basis determined in accordance with their stock ownership the funds necessary to satisfy these obligations as and when due.

2.2 Upon the execution hereof, and in consideration for the issuance of stock of NICE FINANCIAL to him as herein set forth, SOHAIL shall contribute the sum of $500,000.00, and shall loan NICE FINANCIAL the additional sum of $800,000.00, to be repaid as per Section 8 supra. Such funds shall be used solely for satisfying the Corporation's obligation to Wachovia Bank and shall be transferred to NICE FINANCIAL on January 20, 2005.

2.3 Upon the execution hereof, and in consideration for the issuance of stock of NICE FINANCIAL to him as herein set forth, MERCHANT shall contribute the sum of $10.00 and provide consultation services as required, the sufficiency and adequacy of which consideration are hereby acknowledged by all parties.

2.4 Upon the execution hereof, and in consideration for the issuance of stock of NICE FINANCIAL to him as herein set forth, AKBAR shall contribute the sum of $10.00 and provide ongoing managerial and consultation services to NICE FINANCIAL until such time as all

shareholder-nice

conditions of Section 8 of this agreement have been met, the sufficiency and adequacy of which are hereby acknowledged by all parties.

2.5. SOHAIL shall loan NICE FINANCIAL the sum of $400,000.00. Such loan shall be in the form of a line of credit to be drawn upon as and when funds are required for the operation of NICE FINANCIAL. All requests for advances under such loan shall be made to SOHAIL with sufficient advance notice for SOHAIL to determine if such advance is appropriate which decision shall be at SOHAIL's sole discretion. Such loan shall not accrue interest. At any time that any amount of such loan is outstanding, there shall be no distribution of profits to the Shareholders. The loan shall be personally guaranteed by AKBAR and UMANI. In any event, such loan shall be repaid on or before April, 2006. This loan will be collateralized by the 55% of the corporation's stock owned by AKBAR, UMANI, and MERCHANT.

2.5.1 UMANI shall convey by quitclaim deed to SOHAIL a 45% undivided interest, subject to all matters of record, in the improved real property located in Clayton County, Georgia, pursuant to the Quitclaim Deed attached hereto as Exhibit B.

2.6 Subject to the restrictions contained in Paragraph 2.5 infra and Section 8 supra, profits from the Corporation will be distributed on a monthly pro rata basis by the 15th of each month for profits realized during the prior month, based upon the Shareholder's stock ownership; provided however, there shall be maintained an adequate reserve by NICE FINANCIAL to cover ongoing operations in an amount not less than two (2) months of operating expenses.

2.7 UMANI agrees to grant SOHAIL an irrevocable proxy in the form attached hereto as Exhibit C to vote his shares of stock in the Corporation.

2.8 A shareholder meeting shall be held not later than May 1, 2005, and at least one shall be held annually thereafter.

3.

## DEATH OF A SHAREHOLDER

3.1 If a Shareholder dies, the deceased Shareholder's estate shall sell to the Corporation, and the Corporation shall purchase, all of the stock of Corporation owned by the deceased Shareholder within ninety (90) days after the death of the deceased Shareholder or as soon thereafter as the stock of the deceased Shareholder may be legally conveyed by the executor, administrator or personal representative of the deceased Shareholder.

3.2 Corporation and Shareholders agree that the value of each share of the stock of the

shareholder-nice

Corporation owned by Shareholder for the purposes of this Section 3 shall be equal to 1/2500 times the annual revenues of NICE FINANCIAL for the preceding calendar year.

4.

OTHER TRANSFERS

4.1  The fact that a Shareholder shall become disabled or is not actively engaged in the operations of the Corporation shall not create any rights in any Shareholder or in the Corporation to sell or purchase such Shareholder's stock.

5.

REPRESENTATIONS AND WARRANTIES BY NICE FINANCIAL

NICE FINANCIAL represents and warrants to Shareholders as follows:

5.1 NICE FINANCIAL owns and will transfer to Shareholders good, valid, and marketable title to all shares as outlined in Recital, free from trust and free and clear of all security interests, liens, claims, pledges, options, charges, and encumbrances whatsoever.

5.2 As of the Closing Date, NICE FINANCIAL has authorized and issued only 2500 shares of its common stock, and this represents 100% of all outstanding stock of NICE FINANCIAL.

5.3 All financial records furnished by NICE FINANCIAL to Shareholders fairly represent NICE FINANCIAL's financial condition as of closing date, and its results of operation for the period specified in said records.

5.4 NICE FINANCIAL has not incurred any substantial liabilities prior to Closing Date that are not disclosed in EXHIBIT "A" as attached.

5.5 NICE FINANCIAL's representations and warranties contained in this agreement shall survive for a period of two years after Closing Date.

6.

TERMS

6.1  To the extent that insurance proceeds are payable for the specific purpose of funding the purchase of any Stock hereunder, then and in that event the proceeds shall be paid at the time of closing.  In the event the uninsured aggregate purchase price is less than $100,000.00, then the uninsured portion shall be paid in cash at closing.

shareholder-nice

6.2  In the event the uninsured aggregate purchase price is equal to or greater than $100,000.00, then the Corporation shall have the option exercisable in its absolute discretion to finance the excess of the purchase price over $100,000.00 upon terms no less favorable than on a self amortizing monthly basis over five years at the rate of six percent per annum interest.

6.3  The Selling Shareholder shall be entitled to adequate security including the use of the assets of the Corporation or his stock if he is financing the sale.

6.4  The Selling Shareholder shall cooperate with the Corporation and remaining Shareholder and shall execute such documents as may be necessary to facilitate the purchase including the use of the Corporation's assets as security for borrowing to finance such purchase.

7.

MANAGEMENT

Notwithstanding any agreement to contrary or the application of any statute, the Shareholders agree that to the following provisions relating to the management of the Corporation.

SOHAIL or his designee shall be the President of the Corporation. Additional members of the Board of Directors shall be determined and elected at annual Shareholder Meetings.

AKBAR shall be responsible for the business affairs of the Corporation and shall have the final decision making authority concerning the operation of the business. In particular, AKBAR shall be responsible for all personnel issues, store locations, store development, vendor relations, fee structures, and establishing operating policies. Notwithstanding the foregoing, any decision with a financial impact in excess of $9,999.99 shall require the affirmative approval of SOHAIL.

AKBAR, UMANI, and Raj Umani shall receive a monthly salary of $3,000.00 so long as they are actively engaged on a full time basis in the operations of the Corporation.

Monthly financial reports will be provided to the Shareholders by the 25th day of the next following month.  SOHAIL shall have the right from time to time to have access to, and inspect the books and records of the Company.

8.

PLAN FOR REPAYMENT OF LIABILITIES

8.1 The amount of $800,000 shall be repaid to SOHAIL in monthly payments beginning on April 1, 2005 and ending not later than September 1, 2006. During this time, all Corporation

shareholder-nice

profits shall be paid toward repayment of the above amount. Interest shall accrue at the rate of 1% per month, and shall begin to accrue on January 20, 2005.

8.2 At such time as SOHAIL has been repaid the amount of $800,000, he shall release the collateralization of stock as per paragraph 2.5 . MERCHANT shall then take collateralization of stock owned by AKBAR and UMANI, and all Corporation profits shall be paid to ARIF MERCHANT, to repay the amount of $1,200,000.00, as referenced in the attached Subordination Agreement. During the time period that Corporation profits are being paid to ARIF MERCHANT, 45% of such payments shall be deemed to be a loan from SOHAIL to AKBAR and UMANI.

8.3 After such time as ARIF MERCHANT has been repaid in full, MERCHANT shall release as collateral the stock owned by AKBAR and UMANI. AKBAR and UMANI shall repay amounts loaned by SOHAIL under paragraph 8.2 from their share of Corporation profits, and SOHAIL and MERCHANT shall draw profits as per paragraph 2.6.

9

MISCELLANEOUS

9.1 This Agreement shall be binding upon and inure to the benefit of the parties hereto and all persons who may hereafter acquire shares of Corporation and their heirs, executors, administrators, successors and assigns and all such parties and persons.

9.2 The parties hereto agree to vote their shares and to do all and any other things and take all actions necessary or appropriate to carry out the terms, provisions, purposes and intent of this Agreement.

9.3 All certificates representing stock of Corporation shall bear a legend stating that the stock is subject to the terms and conditions of this Agreement.

9.4 It is agreed by the parties hereto that if any additional stock of Corporation is issued to Shareholders, it shall be subject to the terms and conditions of this Agreement.

9.5 This Agreement may not be changed, modified, cancelled or amended, except with the affirmative unanimous vote of a majority of the issued and outstanding shares of Corporation, which amendment, change, modification or cancellation shall be evidenced in writing and signed by all parties.

9.6 Time is of the essence in this Agreement and all of its applicable terms.

shareholder-nice

9.7 This Agreement shall he governed by and construed and enforced in accordance with the laws of the State of Georgia.

9.8 All notices provided for in this Agreement shall be in writing and shall be sent by registered or certified mail, return receipt requested, or delivered in person to the Corporation at parties at the addresses set forth below or at such other address or addresses as any of the parties may from time to time designate in writing to the others. Mailed notices shall be deemed received on the date the person to whom the notice was given signs or refuses to sign for the postal receipt of the notice. Delivered notices shall be deemed delivered and received on the date of tender of delivery. Mailed notices shall be deemed delivered when deposited in the United States mail, postage prepaid, return receipt requested.

9.9 The terms used herein in a particular gender shall be deemed to include each of the other genders, and the terms in the singular number shall be deemed to include the plural number and vice versa, unless the context may otherwise require.

9.10 Indemnification

NICE FINANCIAL agrees to indemnify, defend, and hold harmless SOHAIL and MERCHANT, his successors and assigns, from and against any and all losses, liabilities, fines, penalties, and damages (including any interest thereon), costs and expenses (including reasonable fees and disbursements to counsel), which arise out of, or result from, any inaccuracy in or material breach of any representation, warranty, covenant, or agreement of NICE FINANCIAL contained in this Agreement.

9.11 Corporate Ratification of this Agreement

The parties hereto agree to cause NICE FINANCIAL to ratify, adopt and affirm this AGREEMENT as part of the organizational minutes of NICE FINANCIAL.

10.

RESTRICTION ON COMPETITION

Shareholders shall not, during the term of this Agreement, engage in any activity competitive with or adverse to the business activities of the Corporation, whether alone, or otherwise, or on behalf of any other corporation, as a trustee, fiduciary, or other representative of any other entity within a two mile radius of any facility currently operated by NICE FINANCIAL as of the date hereof. Further, for a period of two years after the disassociation of the

shareholder-nice

Shareholder from the Corporation, he shall not have any financial or beneficial interest in a check cashing facility within a two mile radius of any facility operated by the Corporation on the date of such disassociation.

      IN WITNESS WHEREOF, the undersigned, being duly authorized, have set their hands and seals as of the date first above written.

"SHAREHOLDERS"

_____
Sohail Ali

_____

_____
Irfan Merchant

_____

_____
Madatali Umani

_____

_____
Akbar Ali

_____

"CORPORATION"

NICE FINANCIAL SERVICES, INC.

By:_____
President

shareholder-nice

EXHIBIT A

EXISTING LIABILITIES UNDER PARAGRAPH 2.1

| | | |
|---|---|---:|
| 1. | Arif Merchant | 1,200,000 |
| 2. | Wachovia Bank | 1,300,000 |
| 3. | Travel Exp | 250,000 |
| 4. | Nizar | 300,000 |
| 5. | Mohammed | 275,000 |
| 6. | Riaz | 30,000 |
| 7. | 6380 Tara Blvd Loan | 225,000 |
| 8. | 25% ownership in 1595 North Expway store | 75,000 |
| 9. | 30% ownership in 1153 RDA PKWY store by Riaz | 20,000 |
| 10. | 30% ownership in MLK Store by Aziz | 75,000 |

shareholder-nice

SUBORDINATION AGREEMENT

In consideration for the receipt of $10.00 and for his own interest in the successful ongoing operation of NICE FINANCIAL through inducing SOHAIL to loan NICE FINANCIAL various sums of money, the adequacy and sufficiency of which is hereby acknowledged, the undersigned agrees that any indebtedness or financial obligation or liability owed to him by NICE FINANCIAL is hereby replaced and superceded by the following: the balance due the undersigned is $1,200.000.00, and such sum will be repaid without interest pursuant to terms of the STOCK PURCHASE AND SHAREHOLDER AGREEMENT (hereinafter "AGREEMENT"), Section 8, said agreement dated January 19, 2005 and signed concurrently herewith this subordination agreement. Furthermore, undersigned does hereby relinquish any and all claims upon the assets of NICE FINANCIAL as may arise or have arisen from any contracts between NICE FINANCIAL and ARIF MERCHANT executed prior to Closing Date.

_____                    _____
Arif Merchant                                 WITNESS

_____
NOTARY

ALAINA GUTHRIE
NOTARY
EXPIRES
GEORGIA
OCTOBER 25, 2008
PUBLIC
GWINNETT COUNTY

shareholder-nice

EXHIBIT C
IRREVOCABLE PROXY
AGREEMENT AND IRREVOCABLE PROXY

THIS AGREEMENT AND IRREVOCABLE PROXY (this "Agreement"), dated as of January _____, 2005, is by and among Sohail Ali ("SOHAIL"), and Madatali Umani the undersigned (the "Stockholder").

RECITALS

A.    The Stockholder is the registered holder of that number of shares of the Common Stock (the "Stock"), of Nice Financial Services, Inc., a Georgia corporation (the "Company"), as set forth under the Stockholder's name on the signature page hereto;

B.    In consideration of the investment to be made by SOHAIL in the Company, the Stockholder has agreed to execute and deliver this Agreement to SOHAIL;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Stockholder, the parties hereto agree as follows:

1.    The Stockholder hereby revokes any and all previous proxies granted with respect to any shares of Stock of the Company owned by him.

2.    The Stockholder hereby irrevocably constitutes and appoints SOHAIL as his true and lawful proxy and attorney-in-fact, with full power of substitution, for and in his name, place and stead, to call and attend any and all meetings of the stockholders of the Company and any adjournments thereof, to execute any and all written consents of stockholders of the Company, and to vote all shares of capital stock of the Company presently or at any future time owned beneficially or of record by such Stockholder, including any and all securities having voting rights issued or issuable in respect thereof, which such Stockholder is entitled to vote (all of the foregoing being collectively referred to as the "Shares"), and to represent and otherwise act as the Stockholder could act, in the same manner and with the same effect as if such Stockholder were personally present, at any annual, special or other meeting of the stockholders of the Company, and at any adjournment thereof (a "Meeting"), or pursuant to any written consent in lieu of a Meeting or otherwise.

3.    The Stockholder hereby covenants and agrees that he will not vote at any Meeting or take any action of written consent of stockholders in lieu of a Meeting on any matter whatsoever in contravention of the provisions of this Agreement, and will promptly provide SOHAIL with copies of any stockholder notices given by the Company and received by the Stockholder.

shareholder-nice

4.    The Stockholder hereby covenants and agrees that he will not, and will not agree to, directly or indirectly, sell, transfer, assign, pledge, hypothecate, cause to be redeemed or otherwise dispose of any of the Shares, or grant any proxy, power-of-attorney or other authorization or interest in or with respect to such Shares, or deposit such Shares into a voting trust or enter into a voting agreement or arrangement with respect to such Shares unless and until such Stockholder shall have taken all actions (including, without limitation, the endorsement of a legend on the certificates evidencing such Shares) reasonably necessary to ensure that such Shares shall at all times be subject to the rights, powers and privileges granted or conferred, and subject to all the restrictions, covenants and limitations imposed, by this Agreement and shall have caused any transferee of any of the Shares to execute and deliver to SOHAIL an Agreement substantially in the form of this Agreement.

5.    The Stockholder represents and warrants to SOHAIL that (i) he has full power and authority to enter into this Agreement and to grant the proxy herein contained, and to perform his obligations hereunder, (ii) as of the date hereof, the Shares consist of that number of shares of capital stock of the Company and Options owned of record by him that are set forth opposite below his name on the signature page hereto, (iii) he owns such Shares free and clear of all liens, charges, claims, encumbrances and security interests of any nature whatsoever, except as set forth in any agreement to which SOHAIL is also a party and as provided in the Company's Articles of Incorporation (the "Charter"), (iv) he has the present power and right to vote all of the Shares (except for the Options), and (v) except as provided herein, he has not granted any proxy, power-of-attorney or other authorization or interest with respect to any of such Shares, deposited such Shares into a voting trust or entered into any voting agreement or other arrangement with respect to the voting of such Shares.

6.    The terms and provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without giving effect to the provisions thereof relating to conflicts of law.

7.    The terms and provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the successors and permitted assigns of the parties hereto.

8.    This Agreement shall terminate at the earliest of (i) the date of SOHAIL's death, (ii) ten years from the date hereof, or (iii) the successful initial public offering of the Company's Common Stock.

9.    THE STOCKHOLDER AGREES THAT THE PROXY GRANTED HEREIN AND ALL OTHER POWER AND AUTHORITY INTENDED TO BE CONFERRED HEREBY IS COUPLES WITH AN INTEREST SUFFICIENT IN LAW TO SUPPORT AN IRREVOCABLE POWER AND, EXCEPT AS PROVIDED IN PARAGRAPH 8 ABOVE, SHALL NOT BE TERMINATED BY ANY ACT OF THE STOCKHOLDER, BY LACK OF APPROPRIATE POWER OF AUTHORITY OR BY THE OCCURRENCE OF ANY OTHER EVENT OR EVENTS.

shareholder-nice

10.    The parties hereto acknowledge and agree that performance of their respective obligations hereunder will confer a unique benefit on the other and that a failure of performance will result in irreparable harm to the other and will not be compensable by money damages. The parties hereto agree that this Agreement, including the proxy granted herein, shall be specifically enforceable and that specific enforcement and injunctive relief shall be a remedy properly available to SOHAIL for any breach of any agreement, covenant or representation of the other hereunder.

11.    The Stockholder will, upon request, execute and deliver any additional documents and take such further actions as may reasonably be deemed by SOHAIL to be necessary or desirable to complete the proxy granted herein or to carry out the provisions hereof. The certificates or documents evidencing the Shares shall bear a restrictive legend indicating that they are subject to the terms of this Agreement and may not be transferred, except in compliance with the terms hereof.

12.    If any provision of this Agreement should ever be adjudicated to exceed the time or other limitations permitted by Georgia law, then such provision shall be deemed reformed in such jurisdiction to the maximum time or other limitations permitted by Georgia law.

13.    This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same document.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

Witness:

_____          _____ (SEAL)
                                     Sohail Ali

_____          _____ (SEAL)
                                     Madatali Umani  500 Shares

shareholder-nice

## STOCK SUBSCRIPTION AGREEMENT

The undersigned, in contemplation of the undersigned acquiring common stock in a corporation organized under the laws of the State of Georgia known as NICE CHECK CASHING, INC. agrees that in consideration of the premises and advantages to be derived from said corporation, he will purchase for his own account the number of shares of common stock of said Corporation set forth opposite his signature which is affixed hereto.

The undersigned hereby represents that such shares of common stock of the Corporation are being purchased for investment purposes only and not with a view to distribution or transfer and will be held for his own individual account. Further, it is agreed and understood that such shares have not been registered under the Securities Act of 1933 or under the Georgia Securities Act of 1973 in reliance upon the exemptions contained in Section 4(2) of the Federal Act and Section 9(13) of the Georgia Act [O.C.G.A.] Section 10-5-9 (13)].

It is agreed that the undersigned will pay into the Corporation by conveyance of cash or property the full amount of the subscription as called for by the Corporation immediately.

incorporate.doc

IN WITNESS WHEREOF, the undersigned has affixed his hand and seal, as of the 28 day of September, 1999.

| Signature and Name of Stockholder | Number of Shares | Total Consideration |
|---|---|---|
| Madatali S. Umani | 500 | $500.00 |

Madatali S. Umani

Accepted and agreed to this 28 day of September, 1999.

NICE CHECK CASHING, INC.

BY: _____
Secretary

incorporate.doc

07-29-2006 05:49   SOHAIL ALI                                                    PAGE14

STATE OF GEORGIA

COUNTY OF CLAYTON

### QUITCLAIM DEED

THIS INDENTURE is made this _____19_____ day of January, 2005, between MADATALI S. UMANI, an individual Georgia resident, (hereinafter referred to as "Grantor") and SOHAIL ALI, an individual Georgia resident (hereinafter referred to as "Grantee") ("Grantor" and "Grantee" to include their respective successors, legal representatives and assigns where the context requires or permits).

### WITNESSETH

GRANTOR, in consideration of the sum of Ten and No/100 Dollars ($10.00) and other valuable consideration, the receipt and sufficiency whereof are hereby acknowledged, has granted, bargained, sold, aliened, conveyed and confirmed, and does hereby grant, bargain, sell, alien, convey and confirm unto Grantee an undivided forty five percent (45%) interest in and to ALL THAT TRACT OR PARCEL OF LAND, lying and being in Land Lot 142 of the 13th District of Clayton County, Georgia and being more particularly described as follows:

### SEE EXHIBIT A

This conveyance is subject to all matters of record including any existing deeds to secure debt and zoning ordinances.

TO HAVE AND TO HOLD the land, together with all and singular the rights, members and appurtenances thereof, to the same being, belonging, or in anywise appertaining, so that neither Grantor nor any other person(s) claiming under it shall at any time, by any means or ways, have, claim or demand any right or title to the land or appurtenances, or any rights thereof.

EXECUTED under seal as of the date above written.

Signed, sealed and delivered
in the presence of:

_____                        _____ (seal)
Unofficial Witness                                          MADATALI S. UMANI

_____
Notary Public
My commission expires:
(NOTARIAL SEAL)

ALAINA GUTHRIE
NOTARY
EXPIRES
GEORGIA
OCTOBER 25, 2008
PUBLIC
GWINNETT COUNTY

ug-shareholder-nice.doc

## EXHIBIT "A"

ALL THAT TRACT or parcel of land lying and being in Land Lot 142 of the 13th District of Clayton County, Georgia, and being more particularly described as follows:

BEGINNING at an iron pin on the southwesterly line of the right-of-way of Old Highway 41 located 900 feet southeasterly from the intersection of the southwest side of Old Highway 41 with the north line of Land Lot 142 as measured along the southwesterly line of the right-of-way of Old Highway 41, said point of beginning being at the southeast line of Lot 6, Block B, of the Celia E. May Subdivision, running thence southeasterly along the southwesterly line of Old Highway 41 a distance of 552 feet to its point of intersection with the northeast line of the right-of-way of the new four-lane Highway 41; thence northwesterly along the northeast line of New Highway 41 a distance of 538 feet to a stake at the southeast line of the Celia E. May Subdivision; thence northeasterly along the southeast line of Lot 6, Block B of the Celia E. May Subdivision 92 feet to the Old Highway 41 at the POINT OF BEGINNING.

Said property is known as 6375 Tara Boulevard under the present numbering system of Clayton County, Georgia.

. 07-29-2006 05:50   SOHAIL ALI                                                    PAGE16

STATE OF GEORGIA

COUNTY OF CLAYTON

QUITCLAIM DEED

THIS INDENTURE is made this 19th day of January, 2005, between ARIF MERCHANT, an individual Georgia resident, (hereinafter referred to as "Grantor") and MADATALI UMANI and SOHAIL ALI, individual Georgia residents (hereinafter referred to as "Grantee") ("Grantor" and "Grantee" to include their respective successors, legal representatives and assigns where the context requires or permits).

WITNESSETH

GRANTOR, in consideration of the sum of Ten and No/100 Dollars ($10.00), and other valuable consideration, the receipt and sufficiency whereof are hereby acknowledged, has granted, bargained, sold, aliened, conveyed and confirmed, and does hereby grant, bargain, sell, alien, convey and confirm unto Grantee ALL THAT TRACT OR PARCEL OF LAND, and being more particularly described as follows:

SEE EXHIBIT A

This conveyance is granted in accordance with the STOCK PURCHASE AND SHAREHOLDER AGREEMENT of Nice Financial Services, Inc. and accompanying SUBORDINATION AGREEMENT signed January 19, 2005.

This conveyance is subject to all matters of record including any existing deeds to secure debt and zoning ordinances.

TO HAVE AND TO HOLD the land, together with all and singular the rights, members and appurtenances thereof, to the same being, belonging, or in anywise appertaining, so that neither Grantor nor any other person(s) claiming under it shall at any time, by any means or ways, have, claim or demand any right or title to the land or appurtenances, or any rights thereof.

EXECUTED under seal as of the date above written.

Signed, sealed and delivered
in the presence of:

_____ (seal)
ARIF MERCHANT

_____
Unofficial Witness

_____
Notary Public
My commission expires:
(NOTARIAL SEAL)

ALANA GUTHRIE
NOTARY
EXPIRES
GEORGIA
OCTOBER 23, 2006
PUBLIC
GWINNETT COUNTY

shareholder-nice

07-29-2006 05:50    SOHAIL ALI                                                                    PAGE17

## EXHIBIT "A"

ALL THAT TRACT or parcel of land lying and being in Land Lot 142 of the 13th District of Clayton County, Georgia, and being more particularly described as follows:

BEGINNING at an iron pin on the southwesterly line of the right-of-way of Old Highway 41 located 900 feet southeasterly from the intersection of the southwest side of Old Highway 41 with the north line of Land Lot 142 as measured along the southwesterly line of the right-of-way of Old Highway 41, said point of beginning being at the southeast line of Lot 6, Block B, of the Celia E. May Subdivision, running thence southeasterly along the southwesterly line of Old Highway 41 a distance of 552 feet to its point of intersection with the northeast line of the right-of-way of the new four-lane Highway 41; thence northwesterly along the northeast line of New Highway 41 a distance of 538 feet to a stake at the southeast line of the Celia E. May Subdivision; thence northeasterly along the southeast line of Lot 6, Block B of the Celia E. May Subdivision 92 feet to the Old Highway 41 at the POINT OF BEGINNING.

Said property is known as 6375 Tara Boulevard under the present numbering system of Clayton County, Georgia.

## SECURITY AGREEMENT

For Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, NICE FINANCIAL SERVICES, INC. ("Debtor") does hereby convey and grant a security interest on the following terms to Sohail Ali ("Lender") whose address is 2307 Hunt Crest Way, Lawrenceville, GA 30043.

<u>Grant of Security Interest</u>.  Debtor hereby conveys and grants to Lender security title to and a security interest in that tangible and intangible property and all accessories, parts, rights, receivables, furniture, leasehold improvements, and equipment now or hereafter acquired (the "Collateral") by Debtor at those locations set forth in Exhibit A attached hereto; and all proceeds of any of the foregoing.

2.      <u>Liabilities Secured</u>.  The security interest granted hereby secures all obligations of Debtor to Lender, however created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, including, without limitation, the obligations of Debtor to Lender under the promissory note, of even date, issued by Debtor to Lender (collectively the "Liabilities").

3.      <u>Debtor's Right To Use Collateral</u>.  Until Default hereunder, Debtor may have possession and control of the Collateral and use the same in any lawful manner not inconsistent with this Agreement or with any policy of insurance on the Collateral.

4.      <u>Warranties</u>.  Debtor hereby represents, warrants and covenants that:

4.1.    <u>Financing Statements</u>.  No financing statements covering any of the Collateral are on file in any public office, except any which may have been filed on behalf of Lender.

4.2.    <u>Good Title</u>.  Debtor is and will be the lawful owner of all Collateral, free of all liens and claims whatsoever, except the security interest granted hereby, and Debtor has good right to subject the same to the security interest granted hereby.

4.3.    <u>Correction of Information</u>.  All information now or hereafter furnished by Debtor to Lender relating to this transaction is and will be true and correct as of the date furnished.

4.4.    <u>Location of Business and Collateral</u>.  Debtor's principal place of business is located at the address shown directly below Debtor's signature hereto, and all Collateral is now or will be located at those locations set forth in Exhibit A.

5.      <u>Agreement of Debtor</u>.  Debtor hereby agrees that:

5.1     <u>Additional Assignments</u>.  It will from time to time, in form and content and by procedures satisfactory to Lender, make such additional assignments and transfers as requested by Lender of any or all the Collateral, in order to perfect Lender's security interest as set forth herein.

AG-SECI-2.rev

5.2.   Perfection of Security Interest.  Upon request of Lender, it will execute such financing statements and other documents, pay the cost of filing or recording the same in any public offices deemed necessary or appropriate by Lender, and do such other acts and things, all as Lender may from time to time request, to establish and maintain a valid security interest in all the Collateral, free of all other liens and claims except those expressly permitted or granted hereby.

5.3.   Books and Records.  It will keep at the address shown directly below Debtor's signature hereto all its books and records concerning all of the Collateral, which books and records will be of such character as will enable Lender or its designees to determine at any time the status thereof, and, unless Lender shall otherwise consent in writing, Debtor will not duplicate any such books or records at any other address.

5.4.   Furnishing of Information.  It will furnish Lender such information concerning Debtor, the Collateral and any obligors on any Collateral as Lender may from time to time reasonably request.

5.5.   Inspection.  It will permit Lender and its designees, from time to time, to inspect the Collateral, and to inspect, audit and make copies of and extract from books, records and all other papers in possession of Debtor pertaining to the Collateral and any obligors on any of the Collateral, and, upon request of Lender, will deliver to Lender all such books, records and papers and furnish duly verified copies or summaries thereof in form and content satisfactory to Lender.

5.6.   Notation on records.  Upon the request of Lender, it will stamp on its records concerning the Collateral a notation in form and content satisfactory to Lender of the security interest of Lender hereunder.

5.7.   Transfers and Encumbrances.  It will not sell, lease, assign or create or permit to exist any lien on, or security interests in, any Collateral to or in favor of anyone other than Lender, except as expressly provided herein.

5.8.   Collection Expenses.  It will reimburse Lender for all expenses, including reasonable attorneys' fees and legal expenses, incurred by Lender in seeking to collect or enforce any rights under the Collateral and incurred by Lender in seeking to collect any of the Liabilities and to enforce any rights hereunder.

5.9    Condition.  It will at all times keep the Collateral in first class order and repair.

5.10   Insurance.  It will at all times keep the Collateral insured against loss, damage, theft, and other risks, in such amounts as Lender may reasonably request.

6.   Performance of Debtor's Obligations by Lender.  At its option, Lender may from time to time perform any agreement of Debtor hereunder which Debtor shall fail to perform and take any other action which Lender deems necessary for the maintenance or preservation of any of the Collateral or its interest therein, and Debtor agrees to forthwith reimburse Lender for all expenses incurred in connection with the foregoing, together with interest thereon at the rate of 12% per annum, or at the highest rate permitted by law, whichever is More, from the date incurred until the date of reimbursement.

7.   Events of Default.  "Default" as used herein shall mean the occurrence of any of the following events:

7.1.   Non-payment of Liabilities.  Non-payment, when due, of any amount payable on any of the Liabilities, failure of Debtor to perform any agreement contained herein, or failure of Borrower to perform any agreement with Lender.

2

· 07-29-2006 05:51    SOHAIL ALI                                                                    PAGE20

7.2  Other Defaults.  Any Obligor (which term shall mean Debtor and any party primarily or secondarily liable on any of the Liabilities) fails to make any payment of principal or interest on any other obligation for borrowed money beyond any period of grace provided with respect thereto, or any obligor defaults in the performance of any other agreement, term or condition of any obligation if the effect of such default is to cause or permit the holder of such obligation to cause such obligation to become due prior to the stated maturity date.

7.3.  False Representations.  Any representation or warranty of any Obligor at any time made by Obligor to Lender is untrue in any material respect as of the date made.

7.4.  Insolvency.  Any Obligor becomes insolvent as defined in the Uniform Commercial Code; makes an assignment for the benefit of creditors; files a petition instituting any state or federal insolvency, bankruptcy, reorganization, arrangement, composition, or other debtor relief proceeding; is adjudicated insolvent; petitions or applies to any tribunal for a receiver or trustee for itself or for any substantial part of any of its property; commences any proceeding under any reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any federal or state jurisdiction, whether now or hereafter in effect, or if there is commenced against any Obligor any such proceeding which remains undismissed for a period of thirty days or said Obligor indicates its consent to, approval of, or acquiescence in any such proceeding or the appointment of any receiver or any trustee for the Obligor or any substantial part of any Obligor's property, or suffers any such receivership or trusteeship to continue undischarged for any period of thirty days.

7.5.  Judgments and Levies.  Any judgment against any Obligor or any attachment, seizure of, or levy against any Obligor with respect to a claim for any amount in excess of $25,000.00 which remains unpaid, unstayed on appeal, undischarged, unbonded, or undismissed for a period of thirty days.

7.6.  Death.  Death of any Obligor who is a natural person, or of any partner of any Obligor which is a partnership.

7.7.  Dissolution or Merger.  Dissolution, merger or consolidation of any Obligor which is a corporation or a partnership.

7.8.  Change of Ownership.  Sale, transfer or exchange, either directly or indirectly, of 50% or more of the then outstanding voting securities in any Obligor.

7.9.  Liquidation.  Transfer of a substantial portion of the property of any Obligor.

3

8.    Procedures on Default.

8.1.  Remedies.  At the option of Lender, upon the occurrence of a Default: (a) any or all of the Liabilities (notwithstanding any provisions thereof to the contrary) without demand or notice of any kind may be declared and thereupon immediately shall become due and payable; (b) Lender may exercise from time to time any rights and remedies available to it under applicable law, in equity, or under agreement; (c) Debtor shall at its expense assemble all the Collateral at a convenient place satisfactory to Lender; and (d) Debtor shall pay all costs of Lender of collection of any and all the Liabilities and enforcement of rights hereunder, including reasonable attorneys' fees and legal expenses.

8.2.  Notices.  If any notification of intended disposition of any of the Collateral is required by law, such notification if mailed shall be deemed reasonably and properly given if mailed at least five days before such disposition in accordance with Section 10 hereof.

8.3.  Disposition of Proceeds.  Any proceeds of any disposition of any of the Collateral may be applied by Lender first to the payment of expenses in connection with the Collateral, including reasonably attorneys' fees and legal expenses, and any balance of such proceeds may be applied by Lender toward the payment of such of the Liabilities, in such order of application, as Lender may from time to time elect, and any remaining balance paid to Debtor.

9.    Miscellaneous.

9.1  Custody of Collateral.  Lender shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in its possession if it takes such action for that purpose as Debtor requests in writing, but failure of Lender to comply with any such request shall not of itself be deem a failure to exercise reasonable care, and no failure of Lender to preserve or protect any rights with respect to such Collateral against prior parties, or to do any act with respect to the preservation of such Collateral not so requested by Debtor, shall be deemed a failure to exercise reasonable care in the custody or preservation of such Collateral.

9.2.  Non-waiver of Rights.  No delay or failure on the part of Lender in exercising any right, power, or privilege under this Agreement or under any notes or other instruments given in connection with or pursuant to this Agreement or any of the Liabilities shall impair any such right, power, or privilege or be construed as a waiver of any default or any acquiescence therein.  No single or partial exercise of any such right, power or privilege shall preclude the further exercise of such right, power, or privilege, or the exercise of any other right, power or privilege.  No waiver shall be valid against Lender unless made in writing and signed by Lender, and then only to the extend expressly specified therein.  All remedies provided herein and in any note or other instrument given in connection with or pursuant to this Agreement or any of the Liabilities and all remedies otherwise afforded Lender by law shall be cumulative and shall be available to Lender, from time to time, until all the Liabilities have been paid in full and every other obligation under this Agreement or under any note or their instrument given in connection with or pursuant to this Agreement or any of the Liabilities has been fully satisfied.

9.3.  Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one Agreement.

4

9.4. _Governing Law_. This Agreement shall in all respects be construed in accordance with and governed by the laws of Georgia.

9.5. _Captions_. The captions of the sections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof or used in construing the intent of the parties.

9.6. _Severability_. If any part of any provision of this Agreement shall be invalid or unenforceable under applicable law, said part shall be ineffective to the extent of such invalidity only, without in any way effecting the remaining parts of said provision or the remaining provisions.

9.7. _Modification_. This Agreement shall not be modified or amended except in writing signed by the party to be bound.

9.8. _Survival of Representations_. All representations, warranties, covenants, and agreements contained herein or made in writing by Debtor in connection herewith shall survive the execution and delivery of this Agreement and any and all notes, other agreements, documents and writings relating to or arising out of any of the foregoing or any of the Liabilities.

9.9. _Successors and Assigns_. This Agreement shall bind and inure to the benefit of the parties, their successors, legal representatives, heirs and, where permitted, assigns.

10. _Notices_. All notices and other communications required or permitted by this agreement shall be made in writing, personally delivered or mailed by first class mail, postage prepaid, addressed to Debtor at its address as specified directly below its signature to this Agreement, and to Lender at the address set forth above or to such other address of which the party to receive notice shall give the other party written notice from time to time. Any notice so mailed shall be deemed to have been given and received by the party to whom addressed on the date said notice was properly deposited in the mails.

SIGNED, SEALED AND DELIVERED on February 10th, 2005.

NICE FINANCIAL SERVICES, INC.

By

President

Address:
6705 Jonesboro Road
Morrow, Georgia 30260

5

07-29-2006 05:52   SOHAIL ALI   PAGE1

09-24-2005 10:53   SOHAIL ALI 6784078104   PAGE23

31  20050308

FILED
AYTON CO., GA
2005 FEB 15 AM 11: 15
JUNA T. MILLER
CK. SUPERIOR COURT

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Thomas S. Fisher
Suite 100
1590 Oakbrook Drive
Norcross, Georgia 30093

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Nice Financial Services, Inc. | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 6705 Jonesboro Road | Morrow | GA | 30260 | USA |
| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
| 58-2494241 | | | | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| Ali | Sohail | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2307 Huntcrest Way | Lawrenceville | GA | 30043 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All deposit accounts, receivables, intangibles, furniture, fixtures, and equipment and inventory now or hereafter acquired and the proceeds therefrom located at the stores of debtor listed on exhibit A attached hereto.

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR  ☐ SELLER/BUYER  ☐ AG. LIEN  ☐ NON-UCC FILING
6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.  7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional]  ☐ All Debtors  ☐ Debtor 1  ☐ Debtor 2
8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY - NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

FORM SHOULD BE TYPEWRITTEN OR COMPUTER GENERATED

Sep 24 05 12:57p   Thomas S. Fisher, P.C.   770.449.4851   p.1

## GUARANTY

In consideration of SOHAIL ALI. (the "Lender") consenting to the extension of credit to and as an inducement to LENDER to extend said credit, and acknowledging that LENDER would not otherwise consent to said extension for NICE FINANCIAL SERVICES, INC. ("BORROWER"), and in further consideration of the sum of One Dollar ($1.00) paid by the undersigned to LENDER, the receipt of which is hereby acknowledged, the undersigned, jointly and severally, hereby covenant and agree to and with LENDER, and its successors and assigns, that if default shall at any time be made by BORROWER in the payment of the sums due under that certain Security Agreement and Promissory Note (a copy of such Security Agreement and Promissory Note are attached hereto), the undersigned will well and truly pay the said sums or any arrears thereof that may remain due unto LENDER, and also all damages that may arise in consequence of the non-performance of said covenants, or any of them, (including the payment of reasonable attorney fees and cost of collection) without requiring notice of any such default from LENDER, and this liability of the undersigned shall continue notwithstanding any forbearance, waiver or any amendment of the open account invoices or the insolvency or bankruptcy of BORROWER.

The undersigned, for themselves and their heirs, executors, successors, and assigns, hereby expressly agree, that LENDER may make such changes as may be agreed upon between any of the parties to the Security Agreement or Promissory Note with respect to any of the terms, covenants, conditions, agreements, or provisions thereof without notice to or consent from the undersigned and that any such change(s) shall not relieve the undersigned from any liability hereunder.

The undersigned hereby further covenants and agrees with LENDER that the undersigned may be joined in any action against BORROWER in connection with said Security Agreement and Promissory Note, and that recovery may be had against the undersigned in such action or any independent action against the undersigned without LENDER having first exhausted any remedy or claim against BORROWER.

Sali.guar2

07-29-2006 05:53   SOHAIL ALI   PAGE25

This agreement shall be binding upon the undersigned and their respective successors,
heirs, executors, and administrators of the undersigned, and shall inure to the benefit of LENDER
and its successors and assigns.

This the 10th day of February, 2005.

_____ (SEAL)
Akbar Ali

_____ (SEAL)
Matudali Umani

_____ (SEAL)

*Note: These signatures By
AKBAR ALI AND MADATALI UMANI
Represents obligation needed
to be fulfilled under Investment
obligation "signed under
Stock purchase and share
holder Agreement signed
on 1-19-2005)*

*X ARIF MERCHANT IS NOT PART
OF THIS CONTRACT*

2